[S. F. No. 4469.  In Bank.—December 8, 1908.]

## J. F. PARKINSON COMPANY (a Corporation), Respondent, v. BUILDING TRADES COUNCIL OF SANTA CLARA COUNTY et al., Appellants.

APPEAL—REVIEW OF SUFFICIENCY OF EVIDENCE.—The right of appellants to have the sufficiency of the evidence to sustain the findings reviewed upon appeal from an order denying a new trial, is wholly independent of the fact that the appeal from the judgment was not taken within sixty days, and cannot be affected by the failure of the appellants to move to set aside the judgment under sections 663 and 663½ of the Code of Civil Procedure, upon the ground that the facts found do not support the judgment.

INJUNCTION—BOYCOTT BY LABOR UNIONS—FINDING AGAINST EVIDENCE —COMBINATION AND CONSPIRACY TO INTIMIDATE—QUESTION OF LAW. —In an action to enjoin labor unions and their members from boycotting plaintiff's business, in which plaintiff recovered,—it is held, upon appeal, that a finding to the effect that defendants as individuals and as members of defendant association entered into a combination and conspiracy to injure, coerce, and intimidate the plaintiff, in order to subject its business to their control and management, is against the evidence, except in a qualified sense, and when properly understood it presents a question of law materially different from that arising upon its literal terms.

ID.—LAWFUL COMBINATIONS OF LABORING MEN.—Laboring men and labor unions formed by them, if not bound by any contract to continue work, and not forbidden by statute, and who use no unlawful means, may lawfully combine for their own protection, and may pledge themselves not to work for any employer of "non-union" men and not to handle any material supplied by the employer, and not to work for any contractor dealing with the employer.

ID.—EMPLOYMENT OF JOURNEYMAN TINNER—REFUSAL TO COMPLY WITH UNION RULES—MASTER'S CARD DISALLOWED—STOCK IN CORPORATION.—The employment of a journeyman tinner by plaintiff corporation, at journeyman's wages, who refused to take a journeyman's card under the rules of the Tinners' Union was properly treated by defendants as the employment of a "non-union man." His claim of a "master's card" at a less rate, as an employer, because owning five shares of stock in the plaintiff corporation was properly disallowed by the union.

ID.—STOCKHOLDERSHIP IMMATERIAL—CORPORATION SOLE EMPLOYER.— A stockholder in a corporation, however large his holding, is not, in legal contemplation the employer of persons working for the corporation, which is a person distinct from its members, and is the only employer in the case.    Nor can the holder of a minute fraction of the stock of the corporation for which he is working be deemed his own employer in any substantial sense.

ID.—USE OF WORD "UNFAIR"—TECHNICAL MEANING.—The use of the word "unfair" in relation to an employer of "non-union" men, "declared unfair," and in notices to others not to deal with an employer "declared unfair" is clearly shown to have only a technical meaning as to such employment, clearly understood by all parties, merely imputing a condition upon which "union men" will not work for or deal with such employer, and not as importing any fraud, breach of faith, or dishonorable conduct on his part.

ID.—COMBINATION TO SECURE FAVORABLE CONDITIONS FOR LABOR NOT A CONSPIRACY.—A combination of union men, the object of which is to secure higher wages, shorter hours, and more favorable conditions generally than employers of labor may be willing to concede, notwithstanding in so far as it may be successful, employers might suffer a corresponding loss, does not constitute the same a "conspiracy."

ID.—"CONSPIRACY" DEFINED.—A conspiracy is a combination of two or more persons to accomplish by concerted action a criminal or unlawful purpose, or a lawful purpose by criminal or unlawful means.

ID.—BAD MOTIVE OF LAWFUL ACTION IMMATERIAL.—Where workmen have a legal right to quit work, their mere motive or reason in so doing cannot be questioned.    A bad motive does not convert an act, otherwise lawful, into a ground of action.

ID.—PEACEABLE AND LAWFUL STRIKE.—In case of a peaceable ordinary strike, without breach of contract, and conducted without violence,

threats, or intimidation, the acts of the workingmen being entirely lawful, their motives must be held immaterial.

ID.—TECHNICAL TRESPASS NOT A GROUND FOR INJUNCTION.—A technical trespass committed by the business agent of the labor council, in entering upon the premises of the plaintiff, for the purpose of calling the men out on lawful strike, in the absence of any threatened repetition of the act, is not a ground for an injunction.

ID.—INJUNCTION LIMITED TO THREATENED INJURY—NOTICES TO CONTRACTORS COMPLETE BEFORE SUIT NOT A GROUND.—Notices sent to the contractors employing union men who were dealing with plaintiff, that plaintiff had been declared unfair, which had been completely delivered to them before suit, even if supposed to be without justification, cannot .sustain the injunction, which only applies to threatened injury, and has no application to wrongs which have been completed, and for which the injured party may obtain redress by action at law.

ID.—RIGHT TO NOTIFY CONTRACTORS—WITHHOLDING OF PATRONAGE.— The union men had the right to notify contractors, employing union men, having dealings with their employer whom they have declared unfair for employing non-union men, that their employer has been so declared; and to withdraw patronage from such contractors as continue to deal with such employer. Such notices and withdrawal of patronage afford no ground for equitable relief.

ID.—VIOLATION OF CONTRACTS BY CONTRACTORS—DEFENDANTS NOT RESPONSIBLE.—The notices to the contractors being lawful and in effect importing that if they continued to deal with such employer, they must do so with non-union men, the fact that some of them violated their existing contracts with such employer, cannot be deemed a wrong caused by the defendants. It was a matter for which the contractors are alone responsible to such employer.

ID.—JURISDICTION OF EQUITY—INJUNCTION RELATIVE TO WORK— THREAT.—Equity has no jurisdiction to enjoin men from not working either for the defendant or for those dealing with him, when they have the legal right to quit work; and their threat not to work for any patrons or customers dealing with the plaintiff, affords no ground for equitable relief.

APPEAL from a judgment of the Superior Court of Santa Clara County, and from an order denying a new trial. Hiram D. Tuttle, Judge.

The facts are stated in the opinion of the court

Cleveland L. Dam, C. S. Burnell, Austin Lewis, and R. M. Royce, for Appellants.

Will M. Beggs, for Respondent.

BEATTY, C. J.—This is a suit to enjoin an alleged boy-cott. The plaintiff is the owner and proprietor of a lumber yard at Palo Alto in Santa Clara County, and also of a plumb-ing and tinning shop, mill, etc. It buys and sells lumber, building materials, and hardware, and employs laborers, teamsters, and mechanics. The principal defendant, the Building Trades Council, is a voluntary association composed of delegates from various labor unions of Santa Clara County. The other defendants are labor unions composed of artisans engaged in the various crafts concerned in building opera-tions, the officers of the council and of the several unions and a large number of members of said unions.

The allegations of the complaint are, in brief, that the de-fendants for the purpose of coercing the plaintiff into the subjection of its business to their control entered into a con-spiracy to compel compliance with their demands by force and intimidation, and in pursuance of said conspiracy, gave notice that unless plaintiff should agree to comply with the rules of the Building Trades Council they would declare a boycott, etc. That in consequence of plaintiff's refusal to sign a written agreement presented by the council, agents and emissaries of the defendants unlawfully and against the will of the plaintiff entered upon its premises and notified its employees that they must quit work for plaintiff on pain of being themselves boycotted and turpentined and beaten, etc., thereby causing many of its employees to quit its service; that by threatening injury to them in their business if they continued to do business with plaintiff, the defendant caused persons with whom plaintiff had been dealing to refuse to sell to it, and its customers to cease buying from it; that by these and other acts of the defendant in which they are still engaged and which they threaten to continue, plaintiff has been damaged in a large amount and will be irreparably dam-aged, the defendants and each of them being pecuniarily irre-sponsible and unable to respond in damages. A general and special demurrer to the complaint was overruled and all the defendants united in an answer denying all the material allegations of the complaint except those descriptive of the several parties and their relations to the controversy as above stated. A preliminary injunction was issued and the cause subsequently tried by the court. It was found that

the defendants had not caused persons with whom the plaintiff
had been dealing to refuse to sell to it, but upon the remain-
ing issues generally, the findings were in favor of the plain-
tiff, and by the judgment and decree of the court, the defend-
ants, all and each of them, were enjoined "from boycotting
plaintiff, that is to say from coercing others against their will
to withdraw from plaintiff their beneficial business inter-
course, through or by threats that unless those others do so,
the defendants will cause directly and indirectly, loss to them;
and to desist and refrain from forcibly or by threats of vio-
lence or intimidation, or coercion of any kind, interfering
with plaintiff in the conduct of its business, or at all, and from
forcibly or by threats of force or intimidation, or coercion
of any kind, interfering with any person or persons doing or
desiring to do business with plaintiff, and from obstructing
or interfering forcibly or by threats of force or intimidation,
or coercion of any kind with the business of plaintiff and its
dealings with its customers or its employees, and from forcibly
or by threats of force or intimidation or coercion of any kind,
or in any manner, molesting, harassing, annoying, or inter-
fering with the employees of the plaintiff at any time."

There was also a judgment for one dollar damages and costs
taxed at $304.25.

The defendants in due time moved for a new trial upon a
bill of exceptions, specifying numerous alleged errors in the
rulings of the court at the trial, and numerous particulars in
which it was claimed the evidence was insufficient to justify
the findings. The motion for a new trial was overruled, and
the appeal is from that order and from the judgment. In
support of their appeal the defendants contend that the evi-
dence is insufficient to sustain the findings of the court in
material particulars, and that those findings which are sus-
tained by the evidence will not support the judgment. They
contend, also, that the findings are vitiated by the rulings
admitting and rejecting evidence at the trial against their
objections.

Counsel for respondent objects to any consideration of the
questions raised as to the sufficiency of the evidence to justify
the findings on the grounds: 1. That the appeal was not
taken from the judgment within sixty days after its entry;
and 2. That the defendants have failed to move under sections

663, 663½ of the Code of Civil Procedure. This objection is wholly unfounded. The defendants do not ask us to review the evidence on their appeal from the judgment, and their right to have it reviewed on their appeal from the order is not prejudiced by their failure to move under the sections cited upon the ground that the facts found do not support the judgment.

The first and most important finding of the superior court attacked upon the ground of insufficiency of the evidence to sustain it, is the following:—

"That in order to coerce, and for the purpose of coercing plaintiff into the subjection of its business to the control of said defendants, a combination and conspiracy was entered into by and between the said defendants as individuals and as members of the said defendant associations, and other persons, associations and organizations of persons unknown to plaintiff, and that said persons, defendants, associations and organizations confederated and conspired together to injure, coerce and intimidate plaintiff into compliance with the rules and regulations of said associations, organizations and union, and to the subjection of its business to the control of said defendants and said associations and unions, thus depriving plaintiff of the control and management of its said business."

The evidence does not sustain this finding except in a qualified sense, and when properly understood it presents a question of law materially different from that arising upon its literal terms. The defendants, as above stated, are the Building Trades Council of Santa Clara County, its officers and agents, several labor unions affiliated with the council, and the members of said unions. The council is composed of delegates from the affiliated unions and exercises a general control in matters of common interest to the whole body of its constituents. The unions are voluntary associations organized for the purpose of enforcing regulations which they consider necessary for their welfare. These rules cover a variety of details, including terms of admission into the unions, rates of wages, hours of labor, etc., not of especial importance in this connection, all of which the members are pledged to observe under penalty of fine or expulsion. What we are more immediately concerned with is the rule that union men are not allowed to work on the same job or in the same shop with

non-union men, or to handle or use in their several employ-
ments material which has been supplied by a dealer who
has been declared "unfair" by the council because of the
employment by him of non-union workmen.   The evidence
in this case shows, without conflict, that the Building Trades
Council of Santa Clara County, and its constituent or affil-
iated unions were organized, and that they adopted these and
other rules before there was any controversy with plaintiff,
and without any special reference to it, and that they merely
put its rules in force when, as they contend, the corporation
had become "unfair" and had been so declared, by reason of
its retention in its employment of a tinner who had refused
to join the Tinners' Union.   Their combination and conspir-
acy, if it can be called a conspiracy, was not inspired by any
malicious purpose or feeling against the plaintiff; it embraced
the world at large and consisted wholly in an agreement to
which all the members were pledged that they would refuse
to work for any person or firm who employed non-union men,
and that they would refuse to work upon or handle any
material supplied by an employer of non-union men.   They
were, in other words, organized for the purpose of enforcing
in Santa Clara County what is known as the "closed shop,"
and the means by which they proposed to accomplish their
object was to bind themselves by a mutual pledge to quit
working for any one who should be declared "unfair," either
because he employed non-union men, or because he required
them to handle material supplied by an employer of such men.
This being the situation on the first of February, 1904, the
plaintiff corporation, which seems to have been conducting
its business under some understanding with the council, to
the effect that it would employ only union men, set some
non-union men to work erecting sheds in its lumber yard at
Palo Alto.

The employment of these men was made the subject of
complaint by the business agent representing the council, and
while that matter was still pending another and more serious
controversy arose.   There was a tinner by the name of Water-
man working in plaintiff's shop, who was not a member of the
Tinners' Union.   He was advised by Steuder—a plumber—
to join the union of his, Waterman's, craft, and to take out a
working card.   Being informed that the initiation fee was

twenty-five dollars, he agreed to become a member and gave Steuder five dollars as a first payment upon his application. A few days afterwards he was informed that the initiation fee was fifty dollars. This and other circumstances induced him and Mr. Parkinson, the plaintiff's manager, to believe that the initiation fee had been raised from twenty-five dollars to fifty dollars for the express purpose of "freezing him out," and acting upon Parkinson's advice he determined to withdraw his application for a journeyman's card, and instead thereof to apply for a master tinner's card, which would enable him to continue to do the work he was doing without any violation of the rules of the union, and would cost only five dollars. It was necessary, however, to entitle him to a master's card, that he should be a boss—an employer of labor, not a journeyman working for wages. In order to comply with this condition he purchased five (out of twelve thousand five hundred) shares of the plaintiff corporation's stock (par value ten dollars per share) and upon this basis claimed to be an employer within the rules of the union. His claim was disputed and was clearly untenable. A stockholder of a corporation—even a large and preponderant stockholder is not in legal contemplation the employer of those who are working for the corporation, which is a person distinct from its members, and as such the only employer in the case. Aside from this technical view it is equally clear that the holder of a minute fraction of the stock of a corporation from which he is receiving wages, is not his own employer in any substantial sense. As to this branch of the dispute, therefore, the position of the union, and of the council, in denying Waterman's claim to be a master tinner within the meaning of the union rules, was clearly correct. As to the contention that the initiation fee of the union was doubled in violation of its own constitution for the express purpose of keeping Waterman out, the evidence wholly fails to sustain it. Steuder, it is true, told him that it was twenty-five dollars, but Steuder was a member of the Plumbers' Union, and based his statement upon the rule of his own union and on the former rule of the Tinners' Union. It appears, however, very clearly from the uncontradicted evidence that the preliminary steps for raising the initiation fee of the Tinners' Union of Santa Clara County had been taken in December, 1903, nearly two months before

Waterman was employed by plaintiff, and that it had been ratified by all the superior bodies whose approval was required, as early as February 2, 1904, the day upon which Waterman made his preliminary payment to Steuder, who received it, not as the agent of the union, but as the agent of Waterman. These matters have been stated thus fully and in detail—not because they are regarded as very material in point of law—but because they have been largely discussed in the briefs under the claim upon the part of the respondent that the raising of the initiation fee by the Tinners' Union after Waterman's application for membership, and while he was in the employment of plaintiff, and the subsequent refusal of a master's card, is proof of a malicious determination on the part of the council and union to force a quarrel upon the plaintiff, and to make use of the dispute as a mere pretext for interfering with its legitimate control of its own business. The evidence, in our opinion, does not sustain this contention. The action of the union in this matter was in strict accordance with the rules then in force, and the approval of the council was also in accordance with its established rules. There was no doubt some heat exhibited in the course of the controversy between the parties over this Waterman affair and as a consequence considerable bitterness of feeling engendered on both sides, but what followed was the inevitable outcome of the rules of the council as applied to a situation brought about by causes implying no actual desire on the part of the defendants to injure the plaintiff specially, or to injure it at all except in so far as the enforcement of the rules of the council and its affiliated unions must affect injuriously all who might undertake to carry on business in defiance of those rules. What happened was this: On the ninth day of February the business agent of the council reported the final refusal of Waterman to take out a journeyman tinner's card, and plaintiff's refusal to discharge him from its employment. Plaintiff was then declared "unfair" and on the following day the business agent went upon plaintiff's premises and notified his union employees of that fact, reminding some of them of their pledge to quit work for any employer declared "unfair." He also mailed or delivered notices to all the contractors of Palo Alto employing union men as follows:

"SAN JOSE, February 10th, 1904.

"To all whom it may concern:

"You are hereby notified that J. F. Parkinson Company has been placed on the unfair list of the Building Trades Council of Santa Clara County. And union men cannot work for, or handle any material furnished by said Parkinson until further notice.

"BUILDING TRADES COUNCIL,
"Per CHAS. H. HARRISON, Secretary."

The effect of these notices was that all the union employees of plaintiff quit work and its mill was closed at noon on the tenth day of February, remaining closed until it secured a crew of non-union men. And most of the contractors who had formerly purchased building material from plaintiff ceased to deal with it upon receipt of the written notice addressed to them. On the day following the strike, the council, by its agent, presented to plaintiff the draft of a contract with a demand that it execute it as follows:—

"ARTICLES OF AGREEMENT.

"Article of Agreement between J. F. Parkinson Co. of Palo Alto, Santa Clara County, Cal., and the Building Trades Council of Santa Clara County, Cal.

"Article 1. It is hereby agreed by the J. F. Parkinson Co. of said county and city that work on all buildings or construction work, old or new, erected for their use or by them, shall be done by men carrying the working card of said Building Trades Council of the current quarter.

"Article 2. It is further agreed by the said J. F. Parkinson Co. that they will pay and enforce in full to and with all of their employees working in any craft coming under the jurisdiction of the said Building Trades Council and under the control of the said J. F. Parkinson Co. the schedule of wages and demands that are adopted and demanded by the said Building Trades Council.

"Article 3. It is further agreed by the said J. F. Parkinson Co. that they will employ on all Tinning and Sheet Metal Work directly or indirectly done for or by the said J. F. Parkinson Co. a member or members of the Amalgamated Sheet Metal Workers' International Alliance in good stand-

ing and carrying a regular working card of said Building Trades Council.

"Article 4. In consideration of the foregoing the said Building Trades Council agrees to consider the said J. F. Parkinson Company as a fair firm and to deal with them and their products accordingly.

"Article 5. This agreement shall remain in full force and effect for one year from date hereof."

The plaintiff refused to execute this proposed agreement, and at once set about obtaining the services of a sufficient number of non-union laborers, teamsters, mechanics, etc., to reopen its mill and shops. The mill was shut down for only one week. It does not appear how long the shops were idle. It does appear that Waterman and the foreman of the plumbers worked continuously. There was but a very brief interruption to plaintiff's business before a full resumption in the mill and shops with non-union men, but there was a substantial loss of profits for a time by reason of the withdrawal of patronage by the contractors who had no alternative except to stop buying material of the plaintiff or losing the services of their union employees. Some of the contractors dealing with the plaintiff disregarded the "unfair" notice, and when their union employees quit work replaced them with non-union men. All of the men who quit the employment of plaintiff and of those contractors who disregarded the unfair notice did so peaceably and quietly. There was no force, no threat, no violence or intimidation used against them aside from the reminder addressed to one or two individuals of their obligation to their respective unions. There was no force, violence, threat, or intimidation used towards the non-union men employed in place of the strikers, and no attempt to obstruct the plaintiff in his efforts to secure non-union men. There was not at any time any picketing of the plaintiff's premises or interference with its customers. The most serious act proved against the council was that its business agent in the course of the dispute over the Waterman affair told Mr. Parkinson that they—the council—would drive him out of business if he refused to observe their rules. This, however, was merely an expression of the business agent's opinion of the effect of declaring the plaintiff unfair; it was a warning, or caution, intended no doubt to force compliance with the council's

demands, but evidently it did not have that effect, for Mr. Parkinson being of a different opinion stood his ground and accepted the consequences.

There was also 'some evidence that in three instances individual members of some of the unions had warned some of the strikers that they would incur some danger of personal violence if they returned to work while the plaintiff remained unfair, but these threats were not authorized or countenanced by the council or any of the unions, and not a single act of violence was proved against any one who did return to work.

It was found by the court upon evidence which fully sustains the finding, that the plaintiff had been injured by the acts of the defendants in an amount not susceptible of computation, and it was found that a continuance of such acts would cause a damage irreparable, for the reason, I suppose, that its amount could not be computed, and for the same reason that the plaintiff had no plain, speedy, and adequate remedy at law. It was not found that the defendants were insolvent or unable to respond in damages.

In reference to the word "unfair" it clearly appears that as employed by the defendants and labor organizations generally, it has a technical meaning well understood by the plaintiff and by all the persons to whom the council sent notices that the plaintiff had been declared unfair. Such declaration means, and in this instance was understood by all parties concerned to mean, not that the plaintiff had been guilty of any fraud, breach of faith, or dishonorable conduct, but only that it had refused to comply with the conditions upon which union men would consent to remain in its employ or handle material supplied by it. The sole effect of the notice to the contractors was that a majority of them ceased to deal with the plaintiff, at least for a time, and some of them countermanded orders for lumber and other material previously sent in.

The foregoing statement embraces the substance of all the material findings of the superior court, and indicates the qualified sense in which the principal finding above quoted is to be taken in applying the law to the facts.

Can it be said, in view of this more specific and detailed statement of the probative facts involved in the general finding of the trial judge, that the defendants entered into a con-

spiracy for the purpose of compelling the plaintiff, by coercion and intimidation, to subject its business to their control? Can it be said that they entered into a conspiracy at all?

A combination there certainly was, but it had no reference to the plaintiff except as the business of the plaintiff put it into the general class (employers of labor) who would necessarily be affected by the enforcement of the regulations of the unions. Their object was to secure higher wages, shorter hours and more favorable conditions generally than employers of labor might be willing to concede, and just so far as they might be successful in accomplishing this object it may be assumed that employers, as a class, the plaintiff included, would incur a corresponding loss. But assuming all this, would that constitute the combination a conspiracy? A conspiracy is a combination of two or more persons to accomplish by concerted action a criminal or unlawful purpose, or a lawful purpose by criminal or unlawful means, and to support the conclusion that these defendants were guilty of a conspiracy it must be held that their purpose was at least unlawful if not criminal, or their purpose being lawful that they proposed to attain it by the employment of some unlawful means.

Limiting our consideration for the present to this question of conspiracy, it is clear that the avowed object of these organizations—the several unions of workingmen, and the council in which they were combined—was in no sense unlawful, and the discussion may be confined to the question whether the means proposed for its attainment were unlawful—a question as to which there is a wide divergence of view disclosed by the decisions of the courts of different jurisdictions, and often by the different opinions of judges of the same court. There is, however, at the present day, a tolerably uniform consensus of judicial opinion as to some fundamental principles which form the basis of discussion in all that class of cases, which, for convenience, may be designated as boycotting cases. In one of the more recent of these (*National Protective Association* v. *Cumming*, 170 N. Y. 315, [88 Am. St. Rep. 648, 63 N. E. 369]), the seven justices of the court of appeals were divided, four to three, as to the lawfulness of the avowed object of the defendants, and as to the means employed by them against the plaintiff. Chief Justice Parker

CLIV Cal.—38

three of his associates concurring—held both object and means to have been lawful, while Justice Vann, with the concurrence of the other two justices, condemned the means employed by the defendants to accomplish their purpose, not because the acts of defendants were otherwise unlawful, but because they were rendered unlawful by the selfish and censurable motive which inspired them.

"The object of the defendants," he concluded, "was not to get higher wages, shorter hours or better terms for themselves, but to prevent others from following their lawful calling."

This conclusion was based upon evidence which showed clearly enough what appears as clearly in this case—that the immediate object of the defendants was to exclude the competition of men outside of their unions. This purpose Judge Vann considered so selfish, and its accomplishment so opposed to public policy and common rights as to infect acts otherwise entirely lawful with the taint of illegality. The opposing opinion of the chief justice—the majority opinion—seems to be rested partly upon the ground that in order to secure employment on more favorable terms for themselves, individuals have an absolute right to combine for the purpose of preventing the employment and competition of others, and partly upon the further and independent ground that whether such right is absolute or not, every man is clearly privileged to stop work, with or without reason, whenever he can do so without violating his contract, and that no one can question his motive, since a bad motive does not convert an act otherwise lawful into a ground of action. This last proposition embodies the rule of decision which was approved by this court in the case of *Boyson* v. *Thorn*, 98 Cal. 578, [38 Pac. 492], and which has recently been reaffirmed in the much-discussed case of the *People* v. *Schmitz*, 7 Cal. App. 330, 369, [94 Pac. 419]. In the first-named case it was concluded upon an extensive review of the authorities, American and English, that "an act which does not amount to a legal injury cannot be actionable because it is done with a bad intent." This was more than five years before the same question was considered and decided in England by the House of Lords in the great case of *Allen* v. *Flood*, App. Cas. H. of L., [1898] p. 1. The report of that case covers 180 pages of the volume cited, and

shows that in the House of Lords all the English and several of the American cases were reviewed. Elaborate opinions were delivered by the chancellor, Lord Halsbury, and by eight others of the law lords present and deliberating upon the case. Altogether, it is safe to say that few cases have ever been more thoroughly considered, and the conclusion reached by six out of the nine judges is stated in the head note of the report in substantially the same terms in which this court announced its conclusion in *Boyson* v. *Thorn:* "An act lawful in itself is not converted by a malicious or bad motive into an unlawful act so as to make the doer of the act liable to a civil action."

We are aware that several of the adverse criticisms of our recent decision in the Schmitz case, where this doctrine was applied in construing the indictment, have claimed that it was repudiated by the House of Lords in deciding the later case of *Quinn* v. *Leathem,* App. Cas. H. of L., [1901] p. 495. If this were so, it would afford no conclusive reason for changing the rule of decision here. But nothing could be farther from the truth, and since counsel for respondent in this case places great reliance upon *Quinn* v. *Leathem* as an authority supporting his position it will not be unprofitable to point out the distinction betwen that case and *Allen* v. *Flood*, and to emphasize the fact that so far from overruling *Allen* v. *Flood* upon the particular point in question here, *Quinn* v. *Leathem* lends it additional support and confirmation.

The question for the House of Lords to decide in *Allen* v. *Flood* was whether there was any evidence to support the verdict for the plaintiffs. There was evidence that the defendant had procured the discharge of the plaintiffs by their employers and had prevented their re-employment, and this not only for the purpose of securing their places for members of his own union, *but also for the purpose of punishing them for past acts*. It was held, however, that because the defendant had violated no legal right of the plaintiffs, had done no unlawful act, and had employed no unlawful means in procuring their dismissal, his conduct was not actionable no matter how malicious or bad his motive may have been. (App. Cas. H. of L., [1898] p. 1.) In the case of *Quinn* v. *Leathem* the principal question again presented for decision was whether the evidence for plaintiff should have been submitted to the

jury; whether, in other words, it was sufficient to support the verdict in his favor. Upon this question it was held, without dissent by the six judges participating in the decision, that the evidence did support the verdict, and accordingly the judgment of the trial court was affirmed. Five of the six judges delivered opinions expressing more or less fully their views of the evidence and its effect. The chancellor, Lord Halsbury, who had dissented in *Allen* v. *Flood,* delivered a rather short opinion in which he adopted the more elaborately stated views of Lords Lindley and Brampton. Lord Robertson concurred upon the grounds stated by Lord Justice Holmes in the Irish court of appeal (an opinion which I have not been able to consult); Lords Shand and Macnaghten, who were of the majority in *Allen* v. *Flood,* while expressly adhering to their decision in that case, concurred in the judgment upon the ground that the two cases presented a radically different state of facts. Lord Halsbury in his short opinion while adhering to his views expressed in *Allen* v. *Flood,* concedes that *Quinn* v. *Leathem* "is distinguished in its facts from those which were essentially important facts in *Allen* v. *Flood,*" and in the end bases his decision upon the ground that: "Rightly or wrongly the theory upon which judgment was pronounced in that case (*Allen* v. *Flood*) is one whereby the present is shown to be one which the majority of your lordships would have held to be a case of actionable injury inflicted without any excuse whatever." (p. 507.) Coming next to the more elaborate opinions of Lords Brampton and Lindley (approved in his opinion by Lord Halsbury) we find a fuller and clearer statement of the difference between *Quinn* v. *Leathem* and *Allen* v. *Flood.* Lord Brampton (p. 523) shows that in the earlier case "all questions of conspiracy, intimidation, and coercion or breach of contract, were withdrawn from the jury, the only matters of fact found by them being that Allen maliciously induced the Glengal Company to discharge Flood and Taylor from their employment and not to engage them again, and that each plaintiff has suffered 20£ damages." He proceeds to show that it was assumed as the grounds of decision that "Allen in making the communication which induced the Glengal Company to dismiss the plaintiff was doing only that which he had a legal right to do, and they (the Lords Justices) held, therefore, that the

plaintiffs had no legal cause of action against either the Glengal Company or the defendant, and that the mere fact as found by the jury that the defendant was actuated by a malicious motive could not convert a rightful into a wrongful act." He then proceeds (p. 524) to stamp this doctrine with his express approval in these words: "This latter proposition, that the exercise of an absolute legal right cannot be treated as wrongful and actionable merely because a malicious intention prompted such exercise was established as clear law by this House in *Bradford Corporation* v. *Pickles*, App. Cas., [1895] p. 587, *and it is now too late to dispute it even if one were disposed to do so, which I am not."* Could anything be more emphatic than this in support of the doctrine of *Allen* v. *Flood*, of *Boyson* v. *Thorn*, of *People* v. *Schmitz*, and of the large number of cases in England and in the United States, which like *Boyson* v. *Thorn* have accepted as "a maxim of the law" the words of Baron Parke in delivering the judgment of the common pleas in *Stevenson* v. *Newnham* in 1853: "An act which does not amount to a legal injury cannot be actionable because it is done with a bad intent." (13 C. B., 297.)

Immediately following the passage above quoted from Lord Brampton's opinion he proceeds to demonstrate the scope of the rule by mentioning the limited class of cases which constitute the exception to its operation; such actions, for instance, as libel, false imprisonment, and malicious prosecution, which would always be wrongful and actionable unless privileged, and where proof of a malicious intent defeats the plea of privilege or probable cause. In Lord Lindley's opinion (also approved by Lord Halsbury), where he states the propositions decided in *Allen* v. *Flood*, he uses this language (p. 533): "The first and important proposition is that an act otherwise lawful, although harmful, does not become actionable by being done maliciously in the sense of proceeding from a bad motive, and with intent to annoy or harm another. This is a legal doctrine not new or laid down for the first time in *Allen* v. *Flood*. It had been gaining ground for some time, *but it was never before so fully or authoritatively expounded as in that case."*

I have thus shown that five out of the six judges who sat in *Quinn* v. *Leathem* delivered opinions in the case, that Lords Shand and Macnaghten adhered to their views expressed in

*Allen* v. *Flood,* that Lord Halsbury, who had dissented in that case, concurred with Shand and Macnaghten in holding that *Quinn* v. *Leathem* might be decided as it was decided, without infringing the doctrine of *Allen* v. *Flood,* and that Brampton and Lindley, whose opinions were specially commended by Lord Halsbury, each expressly approved the doctrine of *Allen* v. *Flood.* The importance of that doctrine in its application to controversies such as the present, seems to justify this extended review of a case which has been supposed to have brought it in question, but which when carefully considered will be found to have placed it upon a firmer basis of authority than it occupied before. The rule of law, therefore, as firmly established in England, in this state and in most of the United States, supports the conclusion of Chief Justice Parker and the majority of the court of appeals of New York in the case first above cited (*National Protective Association* v. *Cumming*), so far as it rests upon the doctrine "that an act lawful in itself is not converted by a malicious or bad motive into an unlawful act so as to make the doer of the act liable to a civil action." We may, therefore, in the further consideration of this case confine our attention to what the defendants did and threatened to do, and to the simple question whether those things were or were not, in themselves, lawful. The general objects of the union and the council being lawful, if they used no unlawful means for their attainment, the motives which inspired their action in this case are irrelevant to the question of conspiracy and immaterial as affecting the cause of action.

As to what are lawful acts in furtherance of such objects as were proposed by the defendants in this case, the consensus of recent judicial opinion, above referred to, cannot be better illustrated than by quoting the propositions upon which the majority and the minority of the New York court of appeals, despite their opposite conclusions in *National Protective Association* v. *Cummings*, were entirely agreed. Chief Justice Parker at the outset of his opinion (170 N. Y., p. 320), [63 N. E. 369, 88 Am. St. Rep. 648], says: "I shall assume that certain principles of law laid down by Judge Vann are correct, namely: 'It is not the duty of one man to work for another unless he has agreed to, and if he has so agreed but for no fixed period, either may end the contract whenever he

chooses. The one may work, or refuse to work, at will, and the other may hire or discharge at will. The terms of employment are subject to mutual agreement, without let or hindrance from any one. If the terms do not suit, or the employer does not please, the right to quit is absolute, and no one may demand a reason therefor. Whatever one man may do alone, he may do in combination with others, provided they have no unlawful object in view. Mere numbers do not ordinarily affect the quality of the act. Workingmen have the right to organize for the purpose of securing higher wages, shorter hours of labor or improving their relations with their employers. They have the right to strike; that is, to cease working in a body by pre-arrangement until a grievance is redressed, provided the object is not to gratify malice or inflict injury upon others, but to secure better terms of employment for themselves. A peaceable and ordinary strike, not to harm others, but to improve their own condition, is not in violation of law.' "

This is a most conservative statement of the law. It embraces nothing that is not conceded at this day by even the most determined opponents of the principle of the strike, and contains in the concluding sentence a qualification which the rule of *Boyson* v. *Thorn* would compel us to disregard. In case of a peaceable and ordinary strike, without breach of contract, and conducted without violence, threats, or intimidation, this court would not inquire into the motives of the strikers—their acts being entirely lawful, their motives would be held immaterial. But taking the doctrine as stated by Justice Vann with all its qualifications, it suffices for the decision of everything of real importance in the present controversy, so far as the council and its constituent unions are concerned. The rule that their members could not work with non-union men, or handle material supplied by an employer of non-union men, was adopted before any difference had arisen between them and the plaintiff or its manager. It was a rule which they supposed would benefit them, and that was its sole purpose. Whatever others may think of the policy or justice of such a rule, that is a matter outside the province of the courts, and as with regard to other questions of economic or political aspect, the remedy, if a remedy is needed, must be found by the legislature. In the mean time, and for present purposes,

we must recognize the fact that this rule, as established by the council and the affiliated unions, was devised for the promotion of an object certainly not unlawful, that the occasion which called for its application was the voluntary act of plaintiff's agent, and that with two or three possible exceptions. to be hereafter noticed, the defendants did nothing unlawful in their attempt to make it effective.

Certainly it was not unlawful to call out the union men, and it was not unlawful for the men to cease work which they were bound by no contract to continue.  It was no doubt a technical trespass for the business agent of the council to enter the premises of plaintiff for the purpose of calling the men out for which the plaintiff might have recovered nominal damages in an action at law, but it was no ground for an injunction in the absence of any evidence of a threatened repetition of the act.

Was it unlawful to send the written notices to the contractors employing union labor that the plaintiff had been declared unfair and that union men could not work for it or handle material supplied by it till further notice?  There are authorities on both sides of this question, but I think those which would answer it in the negative have the better reason.  The contractors were working in harmony with the unions (as indeed the plaintiff had previously done) and fair dealing required that the council, representing and acting for the unions,. should protect such contractors from any loss they might incur if left in ignorance of the action. it had taken.  If they had not sent the notices some of those contractors who felt constrained to stop dealing with plaintiff when informed that it had been declared unfair might have purchased material which they could not have used, and it is only upon the assumption that such purchases would have been made, that the plaintiff can base a claim that it was damaged by the notices.  But can plaintiff make such a claim as a ground for equitable relief?  It seems very clear that it cannot; for with full knowledge that it had been declared unfair and of all the consequences flowing from that declaration, it would not have been justified in selling material to a contractor employing union men without disclosing a fact so essential to his freedom of contract.  And if good faith and fair dealing imposed an equal obligation upon the plaintiff and the council to in-

form the contractors of what the plaintiff knew, it is difficult to see what right of plaintiff was infringed by the sending of the notices. Their only effect was to enable the contractors and plaintiff to conduct their future dealings on equal terms.

Nor was there anything unlawful in the presentation to the plaintiff of an agreement embodying the conditions upon which union men would consent to re-enter its service and handle the output of its mill and shops. Conceding that the conditions of the proposed contract were intolerable, the right to propose them stood upon the same plane as the right to reject them, and no right of the plaintiff was infringed unless it can be held that men who are free to work or to quit work, with or without reason, are breaking the law in proposing unreasonable terms as a condition of entering the employment of another. If this were so, why would it not equally follow that an employer would be breaking the law by proposing to men seeking employment conditions of service which they might consider intolerable, or a court deem unreasonable? Neither proposition can be admitted.

The fact that the business agent of the council in the course of the dispute over the Waterman affair told Mr. Parkinson that they would drive him out of business if he refused to observe their rules, is material only in so far as it is an item of evidence tending to show that the course pursued by the council was dictated by a malicious purpose to injure the plaintiff, and not by a desire to benefit its members. I think, myself, as I have in substance said, that it has very slight probative force for that purpose, and that it is completely refuted by all the facts of the case. But conceding that it might have warranted the superior court in concluding that the motives of defendants were tinctured with malice, it cannot be denied that all the acts of the council and its affiliated unions were lawful, and that they were adapted to the promotion of the plans devised by them for bettering the condition of the members. Being so adapted, and being lawful in themselves, they could not be rendered actionable by the mere fact that some feeling of animosity had been engendered in the course of the controversy between the parties.

One other consequence of the strike and the notice to the contractors remains to be considered.

Some of the contractors to whom the notices. were sent countermanded orders for building material which they had already placed with the plaintiff. This it may be conceded was a breach of their contracts, and the law is pretty thoroughly settled both in England and in this country, that causing another to violate his contract with a third party, without a legal justification, is an actionable injury, from which it follows that if the defendants by sending the notices to the contractors caused some of them to break their contracts, and did so maliciously and without justification, they made themselves liable at least to an action for damages. But I do not think it can be said that the sending of the notices was without justification. The plaintiff had been declared unfair, and it was certain that, until that action of the council should be reversed, no member of any of the unions—so long as he remained a member—would handle material supplied by the plaintiff. The contractors to whom the notices were sent were all employing union men, and it was no less the duty of the plaintiff than of the council to inform them, with a view to future transactions, that they could not use material supplied by the Parkinson Company without engaging non-union men in place of the men they had. If this is so—if the notice to the contractors was proper and essential to fair dealing, as between them and the plaintiff—the fact that some of them violated their existing contracts cannot be deemed a wrong caused by the defendants. It was a wrong for which the contractors alone were responsible.

But even if it could be held that the action of the council in sending the notices was without justification and malicious, something would still be wanting to sustain the injunction. The notices had all been sent before this action was commenced, and there was no evidence of any threat to send notice to any other persons. An injunction lies only to prevent threatened injury and has no application to wrongs which have been completed, and for which the injured party may obtain redress by an action at law.

This proposition involves a consideration of the sufficiency of the evidence to support the fifth finding of the trial court: "That said defendants threatened to continue to coerce and intimidate plaintiff and its patrons and customers to the irreparable damage and injury of plaintiff." Being challenged

to point out the evidence to support this finding, counsel for respondent cites us to the testimony of only one witness (Harrison, an officer of the council), the entire substance of which is a mere restatement of the rule forbidding union men to work for a person declared unfair, or to handle his material. The finding, therefore, so far as it is sustained by the evidence, means no more than this: There is a standing warning that union men will not work for plaintiff while it remains on the unfair list, or handle its material. This is the whole extent of the coercion and intimidation threatened, and against such a threat an injunction would be utterly impotent. To enjoin men from not working would be wholly ineffective unless there resides in the courts a power to compel them to go to work. But there is no such power. A court of equity cannot even enforce specifically a contract for personal services, and much less can it enforce the performance of such services in the absence of any contract.

I have not overlooked the fact that there was evidence that two or three individual members of the unions used threatening language in one or two instances towards other members who spoke of returning to work, and there may have been reason to conclude that they would continue to employ threats of the same character to deter others from seeking employment with the plaintiff. If so, the court would have been justified in enjoining those individuals, but there was nothing to justify an injunction against the council or the unions, or their officers, or the large number of individual members who made no threats.

I have not attempted to review in detail the numerous cases cited by counsel in support of the judgment. The task indeed would be endless. Speaking generally it may be said that many of them relate to propositions which are not here questioned, while many of the others, like *Quinn* v. *Leathem*, App. Cas. H. of L., [1901] p. 495, were actions for damages for unlawful interference with a legitimate business, in which, as in that case, the verdicts were sustained, and on substantially the same grounds. We do not question the doctrine of *Quinn* v. *Leathem*, as we gather it from the opinions of the judges—particularly those of Lords Brampton and Lindley, with which the lord chancellor agreed. Any injury to a lawful business, whether the result of a conspiracy or not, is

*prima facie* actionable, but may be defended upon the ground that it was merely the result of a lawful effort of the defendants to promote their own welfare. To defeat this plea of justification the plaintiff may offer evidence that the acts of the defendants were inspired by express malice, and were done for the purpose of injuring plaintiff and not to benefit themselves. The principle is the same which permits proof of express malice to defeat the plea of privilege in libel, or the defense of probable cause in actions for malicious prosecution or false imprisonment. In such cases as *Quinn* v. *Leathem* a verdict for the plaintiff imports a finding by the jury that the injurious acts of the defendants, which standing by themselves are actionable, have not been justified, or, in other words, that they were done to injure the plaintiff and not to benefit the defendants, or that the means employed were unlawful. In *Quinn* v *Leathem* the verdict was supported on both grounds. There was proof of express malice, and of unlawful means employed to injure plaintiff's business. In this case there was overwhelming proof that the council, when the occasion arose, simply put in force a rule long before adopted for their own benefit and not directed against the plaintiff or any particular person. Nor did the council, the unions, or their members generally, use any unlawful means to injure the plaintiff, unless it was unlawful to send the notices. I have expressed the opinion that so far from being unlawful the sending of the notices was only the fulfillment of a duty under the circumstances, but whether so or not, since the contractors doing business in Palo Alto and employing union men had all received the notices before the action was commenced, and there was no threat to send notices to any other persons, there was nothing to enjoin. As to the sending of notices that a firm or corporation has been declared "unfair," the authorities are by no means uniform that such notices are unlawful. In the case of *Gray* v. *Building Trades Council,* 91 Minn. 171, [103 Am. St. Rep. 477, 97 N. W. 663], (a Minnesota case cited by respondent) the supreme court modified an injunction by striking out that part which restrained the giving of unfair notices, and this for reasons equally applicable to the present case.

There is nothing in our decision in *Goldberg* v. *Stablemen's Union,* 149 Cal. 429, [117 Am. St. Rep. 145, 86 Pac. 806], at all

inconsistent with the views herein expressed. By their demurrer to the complaint the defendants in that case admitted the truth of all that was charged, and the injunction as modified restrained only acts of violence and intimidation.

For the reasons above stated the judgment of the superior court is reversed.

Lorigan, J., concurred.

SLOSS, J., concurring.—I concur in the judgment, but am not prepared to assent to everything that is said in the main opinion.

What is particularly to be borne in mind is that we are not here concerned with a strike or boycott presenting any of the features of violence, either expressly or impliedly threatened, to be found in so many of the decided cases. There was here no effort or threat to interfere by physical force with the plaintiff or its employees, nor any intimidation of employees or customers, using the term "intimidation" as meaning an act tending to inspire fear of violence to person or property. One may, to be sure, be put in fear of violence without the use of any word indicating an intent to resort to force. "Picketing," as practiced in labor disputes, may, and perhaps usually does, constitute an intimidation of the employees and patrons of the person whose establishment is picketed. (*Goldberg* v. *Stablemen's Union,* 149 Cal. 429, [117 Am. St. Rep. 145, 86 Pac. 806].) The carrying, near a place of business, of banners calling upon laborers to remain away from such place, has been treated as a form of menace directed against those who might seek employment. (*Sherry* v. *Perkins,* 147 Mass. 212, [9 Am. St. Rep. 689, 17 N. E. 307].) So, too, words which, of themselves, purport to express merely a request, may be uttered in such manner and under such circumstances as to convey to the hearer a plain threat that refusal to comply with the request (or demand) will result in physical harm to him. None of these considerations are, however, presented in this case. In so far as the injunction restrains the defendants from the use of force or threats of violence, it is clearly not supported by any evidence.

Nor need we here consider how far it is unlawful, whether by persuasion or other means, to induce one of the parties to

a contract to break it to the damage of the other. As is pointed out in the opinion of the chief justice any acts of this character that may have been committed by the defendants had occurred prior to the commencement of the action, and there was no evidence that any further interference in this direction was to be anticipated. There was, therefore, no basis for enjoining such acts.

The real question in the case turns upon the activities of the defendants exerted in two ways: 1. In ceasing to work for the plaintiff (striking), and 2. In notifying (or threatening, if that term be preferred) the customers of plaintiff that workmen affiliated with the Building Trades Council would not work for contractors using materials purchased of plaintiff.

That workmen employed by the Parkinson Company had a right to leave its employ whenever they desired, and for any reason that might seem to them sufficient, is universally conceded. Was it unlawful to notify contractors dealing with the Parkinson Company that union men would not continue to work for them if they purchased material of said Parkinson Company? In this inquiry, I think it is unimportant that the defendants were merely acting in accordance with a rule adopted before any difference with the plaintiff had arisen. The opinion of the chief justice appears to proceed upon the theory that, since the defendants had bound themselves to act in a certain way in the event of a controversy of this kind, it was not only proper, but laudable, for them to notify contractors of their intended action and of the consequences which would follow to contractors who should continue to deal with the plaintiff. More than this, that it was in some way incumbent upon plaintiff to notify contractors dealing with him that a continuance of their patronage would be likely to result in loss to them. I cannot agree to the proposition that the rights of the parties are in any way affected by such considerations. If the defendants' course of conduct amounted to an unlawful interference with plaintiff's rights, it was not made lawful by the fact that the defendants had decided, in advance, to act in this way whenever an occasion should present itself.

But was their action unlawful? They had a right, as has been said, to cease working for Parkinson. They had an equal right to cease working for any other employer. Upon what

ground, then, is it claimed that while their refusal to work for plaintiff gave plaintiff no cause of complaint, the refusal to work for others did give plaintiff a ground of action? Because, it is said, they are bringing to bear upon the Parkinson Company, with which they have a controversy, the pressure of loss inflicted by third persons, not connected with the main dispute, and are, by holding over these third persons the risk of financial loss, compelling them, against their will, to inflict upon Parkinson the damage resulting from a cessation of their patronage. This is the argument commonly advanced to establish the illegality of what has been called, in much of the recent discussion of the subject, a "secondary" rather than a "primary" boycott. I do not see that we are helped to a solution of the question of the illegality of the defendants' acts by looking into the "motive" or "intent" with which they acted. Even if we assume, contrary to the decisions of this court, that an improper motive may, as a general proposition, render actionable an act otherwise lawful, or, to use another form of statement, that damage intentionally inflicted will be actionable unless its infliction can be justified by showing that it was inspired by a proper motive, the motive with which these defendants acted was not, in my opinion, one which the law regards as improper. The defendants were seeking, in all they are shown to have done, to secure employment by the plaintiff for themselves, to the exclusion of those not associated with them, and to secure that employment upon terms deemed satisfactory or advantageous to them. That is the effort of every dealer in goods; it is the struggle of competition, and is no more to be frowned upon where the subject of trade is labor than where it is a specific commodity. The uniting or combining of a number of persons to accomplish a lawful object by lawful means will not, *per se,* render the conduct of the many any more unlawful than would be the same conduct on the part of any one of them. "It is plain," as is said by Mr. Justice Holmes in his dissenting opinion in *Vegelahn* v. *Guntner,* 167 Mass. 92, 108, [57 Am. St. Rep. 443, 44 N. E. 1077], "from the slightest consideration of practical affairs, or the most superficial reading of industrial history, that free competition means combination, and that the organization of the world, now going on so fast, means an ever increasing might and scope of combination. . . . One of the eternal con-

flicts out of which life is made up is that between the effort of every man to get the most he can for his services, and that of society, disguised under the name of capital, to get his services for the least possible return. Combination on the one side is patent and powerful. Combination on the other is the necessary and desirable counterpart, if the battle is to be carried on in a fair and equal way."

The injunction then, must rest upon the principle that it is unlawful, in an effort to compel A to yield a legitimate benefit to B, for B to demand that C withdraw his patronage from A, under the penalty of losing B's services or patronage, to which he has no contract right. That there are many cases sustaining the affirmative of this proposition is true. (*Thomas* v. *Cincinnati etc. Ry. Co.*, 62 Fed. 803; *Hopkins* v. *Oxley Stave Co.*, 83 Fed. 912, [28 C. C .A. 99]; *Vegelahn* v. *Guntner*, 167 Mass. 92, 108, [57 Am. St. Rep. 443, 44 N. E. 1077]; *Beck* v. *Railway Teamsters' Protective Union*, 118 Mich. 497, [74 Am. St. Rep. 421, 77 N. W. 13]; *Gray* v. *Building Trades Council*, 91 Minn. 171, [103 Am. St. Rep. 477, 97 N. W. 663]; *Barr* v. *Essex Trades Council*, 53 N. J. Eq. 101, [30 Atl. 881]; *Lucke* v. *Clothing C. & T. A.*, 77 Md. 396, [39 Am. St. Rep. 421, 26 Atl. 505]; *Jackson* v. *Stanfield*, 137 Ind. 592, [36 N. E. 345, 37 N. E. 14]; *Crump* v. *Commonwealth*, 84 Va. 927, [10 Am. St. Rep. 895, 6 S. E. 620].)

So are there many to the contrary. (*Mogul Steamship Co.* v. *McGregor, L. R.*, [1892] App. Cas. 25; *National Protective Assoc.* v. *Cumming*, 170 N. Y. 315, [88 Am. St. Rep. 648, 63 N. E. 369]; *Clemmitt* v. *Watson*, 14 Ind. App. 38, [42 N. E. 367]; *Cote* v. *Murphy*, 159 Pa. St. 420, [39 Am. St. Rep. 686, 28 Atl. 190]; *Macauley Bros.* v. *Tierney*, 19 R. I. 255, [61 Am. St. Rep. 770, 33 Atl. 1]; *Bohn Mfg. Co.* v. *Hollis,* 54 Minn. 223, [40 Am. St. Rep. 319, 55 N. W. 1119]; *Payne* v. *Western etc. R. R. Co.*, 13 Lea, 507, [49 Am. Rep. 666]; *Heywood* v. *Tillson*, 75 Me. 225, [46 Am. Rep. 373]; *Raycroft* v. *Tayntor*, 68 Vt. 219, [54 Am. St. Rep. 882, 35 Atl. 53]; *State* v. *Van Pelt*, 136 N. C. 633, [49 S. E. 177]; *Lindsay & Co.* v. *Montana Fed. of Labor*, (Mont.) 96 Pac. 127.)

This enumeration does not attempt to cite all of the great mass of authority that might be referred to as bearing upon the proposition here involved. Nor do I undertake to review or to reconcile the well-known English cases of *Allen* v. *Flood* and *Quinn* v. *Leathem*.

Upon a consideration of the authorities I think the sounder rule is that one who is under no contract relation to another may freely and without question withdraw from business relations with that other. This includes the right to cease to deal, not only with one person but with others; not only with the individual who may be pursuing a course deemed detrimental to another who opposes it, but with all who by their patronage aid in the maintenance of the objectionable policies. In other words, if the defendants violated no right of the Parkinson Company by refusing to work for it, they violated none by refusing to work for contractors who used material bought of Parkinson. Such refusal, as is shown in the opinion of the chief justice, and as is stated in the testimony of plaintiff's manager and principal witness, was the "sum total of the interference" which was practiced or threatened. An agreement by shipowners, in order to secure a carrying trade exclusively for themselves, that agents of members should be prohibited upon pain of dismissal from acting in the interest of competing shipowners (*Mogul S. S. Co.* v. *McGregor,* L. R., [1892] App. Cas. 25); a combination of retailers binding the members to refuse to purchase of wholesalers who should sell to non-members of the combination (*Bohn Mfg. Co.* v. *Hollis,* 54 Minn. 223, [40 Am. St. Rep. 319, 55 N. W. 1119]; *Macauley Bros.* v. *Tierney,* 19 R. I. 255, [61 Am. St. Rep. 770, 33 Atl. 1]; an agreement of contractors to withdraw their patronage from wholesalers selling to a contractor who had conceded the demands of his employees for an eight-hour day (*Cote* v. *Murphy,* 159 Pa. 420, [39 Am. St. Rep. 686, 28 Atl. 190]; a threat by a railroad company to discharge any employee who should deal with the plaintiff (*Payne* v. *Western etc. R. R. Co.,* 13 Lea, 507, [49 Am. Rep. 666]; a threat by an employer that he would discharge any laborer who rented plaintiff's house (*Heywood* v. *Tillson,* 75 Me. 225, [46 Am. Rep. 373],) have been held to give no right of action to the individuals affected. The defendants in each case were held to be acting within their absolute legal right in entering or refusing to enter into business relations with persons to whom they were not bound by contract. I see no reason why workmen have not the same absolute right to dispose of their labor as they see fit. So long as they abstain from breach of contract, violence, duress, menace, fraud, misrepresentation, or other unlawful means, they

may lawfully inflict such damage as results from the withholding of their labor or patronage.    To quote again from Judge Holmes's opinion in *Vegelahn* v. *Guntner*, 167 Mass. 92, [57 Am. St. Rep. 443, 44 N. E. 1077], "If it be true that workingmen may combine with a view, among other things, to getting as much as they can for their labor, just as capital may combine with a view to getting the greatest possible return, it must be true that when combined they have the same liberty that combined capital has to support their interests by argument, persuasion, and the bestowal or refusal of those advantages which they otherwise lawfully control."

The terms "intimidation" and "coercion," so frequently used in the discussion of this question, seem to me to have no application to such acts as were here committed.    One cannot be said to be "intimidated" or "coerced," in the sense of unlawful compulsion, by being induced to forego business relations with A, rather than lose the benefit of more profitable relations with B.    It is equally beside the question to speak of "threats," where that which is threatened is only what the party has a legal right to do.

It may be that the combination of great numbers of men, as of great amounts of capital, has placed in the hands of a few persons an immense power and one which, in the interest of the general welfare, ought to be limited and controlled.    But if there be, in such combinations. evils which should be redressed, the remedy is to be sought, as to some extent it has been sought, by legislation.    If the conditions require new laws, those laws should be made by the law-making power, not by the courts.

ANGELLOTTI, J., concurring.—I concur in the judgment, and generally in what is said by the chief justice in his opinion, upon such matters as are material to a determination of this appeal.    The only material question in the case as to which there can be any doubt under the law as it is now generally stated by the courts, is whether the defendants have been and are guilty of any such coercion or intimidation towards patrons of the plaintiff, tending to injure its business, as would warrant the granting of relief by injunction.    Their offending in this regard was simply the notification given by them to contractors who were patrons of plaintiff and employers of union

men, that plaintiff had been "placed on the unfair list of the Building Trades Council of Santa Clara County," and that "union men cannot work for, or handle any material furnished by said Parkinson until further notice." This notice concededly meant only that plaintiff had refused to comply with the conditions upon which union men would consent to remain in its employ, or handle material supplied by it while in the employ of any one else. While it was in effect a statement to the effect that if the persons notified desired to retain union men in their employ, they must refrain from using material supplied by plaintiff, and was thus effectual to deprive plaintiff to its injury of the patronage of those who preferred to retain such union employees, I do not think it constituted the coercion or intimidation as to which the courts can extend relief. In the absence of statutory prohibition of such combinations, the right of persons, no matter how numerous, to voluntarily agree among themselves to withhold their labor from any one for any reason they see fit, and voluntarily abide by such agreement, seems clear. The decisions now generally recognize that right so far as an employer with whom some dispute has arisen and who refuses to grant demands which they deem essential to their interests, is concerned, even though the effect of their refusal to work for him would be most injurious to him. If he yields to their demands, he may be said to have been coerced into doing so by the fear that if he does not, he will not be able to obtain such employees as will enable him to properly carry on his business, but this is not the kind of coercion of which the courts can take notice. Those who have labor to give have the same right to insist upon the terms upon which it shall be given by them as have employers to refuse to employ except upon such terms as they see fit to make, and the law will not interfere with either class in the lawful exercise of that right. Even where the courts hold that the motive with which an otherwise lawful act is done may render the act unlawful, it is held that there is no unlawful motive where there is a mere refusal of organized labor to work for one who refuses to concede such terms as to wages, hours, etc., as they in good faith demand, for the purpose of compelling him to accede to more reasonable terms. But in this state and in most of the other states, the motive with which a lawful act is done is absolutely immaterial. Where

such is the rule, the right of persons associated in labor unions to voluntarily withhold their labor for any reason and with any motive would appear to be absolute, and, after careful consideration of the authorities, I can see no material distinction so far as the lawfulness of the act is concerned between the withholding it from A with whom they have some dispute arising out of his treatment of union labor, and withholding it from B against whom they have no other grievance than that he is assisting A by trading with him. That their motive in withholding it from B is to induce A to accede to their terms through the apprehended loss of B's patronage is immaterial, even if it be conceded that there is anything wrong in such a motive, which I do not grant. On this point, I am in entire accord with the views expressed by Justice Sloss. But regardless of this, their simple withholding of labor being lawful, the courts will not inquire into their motives. We are, of course, speaking of cases where there is no contract between employer and employee under the terms of which the legal obligation rests upon the employees to continue work. There is no consideration of that kind in this case, and we need not consider how it would affect the question. If employees thus banded together have a lawful right to withhold their labor from one unless he refrains from patronizing another, there can be nothing unlawful in their simple announcement that they intend to do so. It may be claimed by some that such combinations of labor are inimical to the public welfare, but that, it appears to me, is purely a question for the legislative department of the government. The question, in this respect, is the same in character as would arise over any kind of combination for business purposes. If any of plaintiff's customers were guilty of a breach of contract with plaintiff because of the knowledge of the intention of the defendants communicated to them, that was a matter purely between such customers and the plaintiff, and one for which the defendants were in no way legally responsible.

Henshaw, J., and Melvin, J., concurred with Angellotti, J.

SHAW, J., dissenting.—I dissent. I think the judgment should be modified, but that it should not be reversed.

The plaintiff complains of both a strike and a boycott and asks an injunction against both. So far as the matter of the alleged strike of plaintiff's men is concerned, I think the defendants did nothing which they did not have a lawful right to do and that they used no unlawful means in doing what they did. The plaintiff was employing a number of men who belonged to the several unions represented by the Building Trades Council, and it was understood by all the members of the unions that they would not work for an employer who persisted in employing non-union men in the business. The plaintiff employed non-union men and thereupon the union men in its employ quit work. There was no violence used and no effort made to prevent plaintiff from securing other men to work, or to prevent other men from seeking its employment. The men had an absolute right to quit work at any time. None of the defendants used any improper means to induce the men to quit. They were simply informed that the plaintiff had refused to discharge the non-union men, and thereupon, in accordance with the rules of the unions, which amounted to a previous agreement of all the members between themselves, they left the plaintiff's service. The judgment purports to enjoin the defendants from "molesting, harassing, annoying or interfering with the employees of plaintiff at any time," by "threats of force, intimidation, or coercion." There is no evidence that the employees had been or would be threatened, or coerced, or that they had been harassed, annoyed, molested, or interfered with. This part of the judgment is therefore without support. An injunction should not be granted against the doing of acts which have not been done or threatened.

I think the judgment is sustained by the evidence in so far as it enjoins the continuance of the alleged boycott. The defendants are forbidden to coerce plaintiff's customers to withdraw their custom from plaintiff by threats that unless they do so the defendants will cause loss to them in their business.

The respective unions represented by the Federated Trades Council were twenty-two in number. It does not appear how many members they had in the aggregate, but it is plain from all the circumstances that the membership included the majority of the workmen in that vicinity engaged in the

respective trades, and that they were of such numbers that if they all refused to work for any contractor engaged in building enterprises in that neighborhood, such contractor would be unable to carry on his business without substantial loss. The agreement of the union men that they would not work for any contractor who employed non-union men, or who used material made by any manufacturer or sold by any dealer who employed non-union men, was embodied in their rules adopted by them long before any difficulty had arisen with the plaintiff and without any reference whatever to the plaintiff. It was a general regulation and agreement, intended to apply to all persons and to be enforced whenever any occasion arose which made it applicable. The method of putting it in force was that the Building Trades Council, when it found any contractor, dealer, or manufacturer, employing non-union men, or using non-union materials, sent out notices to all union workmen and to other dealers and contractors that the person in question was "unfair," and thereupon it was understood that all men in the employ of such other persons would refuse to work for their respective employers unless such employer refused to use materials received or purchased from such boycotted person. When the Parkinson Company employed non-union men these notices were immediately sent to all its customers. As a result its customers immediately countermanded such orders to plaintiff for goods as were then unfilled and ceased thereafter to deal with plaintiff. The evidence showed that at least seven of the plaintiff's important customers quit dealing with the plaintiff, that substantial damage had already been caused to the plaintiff by this loss of custom, during the time it had continued, and that its further continuance would cause plaintiff further substantial loss, that these customers were, by the aforesaid threats of defendants, coerced and compelled, against their wish and will, to cease dealing with plaintiff or using goods obtained from plaintiff, and that the defendants intended and threatened to continue this boycott indefinitely.

The claim of the defendants appears to be that these notices were intended for the benefit of the several persons to whom they were sent, to warn them of the consequences that might attend their patronizing the plaintiff, so that they could avoid doing so, and thereby escape the evil results that would

otherwise come to them, and that the sending of notices for such a purpose is not only lawful and innocent, but praiseworthy, as well; that these consequences would not come as the result of any act done with reference to the parties warned, but as the result of conditions that existed under the union rules established long before any difficulty with plaintiff arose. These rules seem to be regarded as of similar force to the law of the land and a notice not to disregard them as a friendly act similar to a notice to a friend not to violate the law. I concede, of course, that where a strike has been determined upon, the mere sending of a notice of the fact is not unlawful, or blameworthy, and cannot be made the foundation of an action. Perhaps the sending of these notices, under some circumstances, might have been considered as an act of this character. But under the circumstances disclosed in this case, and in view of the findings of the court which show that the acts of the defendants were intended to coerce plaintiff's patrons to cease dealing with plaintiff in order to injure plaintiff in its property rights, the conduct of the defendants must be considered as malicious and unlawful.

The defendants had the right, by lawful means, to persuade or induce others to cease dealing with plaintiff, although their purpose in so doing was to injure the plaintiff in its business and constrain plaintiff to yield to their demands in regard to the conduct of plaintiff's business. It is only when they seek to accomplish such injury by the use of means which the law deems unlawful that their action to that end becomes unlawful and the resulting injury an actionable wrong.

The entire case depends on the question whether or not the means by which the defendants induced the plaintiff's customers to cease dealing with it were unlawful.

It is settled in this state, and for the most part in other jurisdictions also, that, in cases where one person induces another to do an act, injurious to a third person, the mere fact that the person instigating the doing of the act was actuated by a bad motive, or by malice toward the third person, will not make his instigation unlawful. (*Boyson .v Thorn,* 98 Cal. 578, [33 Pac. 492].) The effect of the authorities, in cases like the present, is that, in order to make such instigation unlawful, the customer must be induced to cease dealing with the party intended to be injured, by means of

some force, intimidation, or coercion which destroys his freedom of action and constrains him to cease such dealing when he does not wish to do so and would not do so except for the constraint put upon him. In *People* v. *Schmitz,* 7 Cal. App. 330, [94 Pac. 419], it is said that the means used to induce the injurious action toward the third party, and which, if used, will make the resulting injury actionable, includes duress, menace, fraud, and undue influence, as defined in sections 1569, 1570, 1572, and 1575 of the Civil Code. According to these sections, fraud involves deceit, duress, confinement of the person or detention of property, and menace a threat of violence to person or property or of an attack on character. Neither of these things occurred here. The class to which the conduct of the defendant belongs, if it can be characterized as illegal, is that of undue influence. In the decisions on the subject this method of influencing the action of others is usually included with various forms of menace and is designated as intimidation, or coercion. In other jurisdictions there are no code provisions defining the general principles of law such as we have in the Civil Code. By the provisions of the code above mentioned a contract which is procured by either duress, menace, fraud, or undue influence is said to be voidable. The use of such means is characterized as illegal. It is not necessary, in order to constitute such undue influence, or coercion, that there should be any sort of physical violence done or threatened, or that there should be any act done or threatened, which, in itself, and apart from its effect in controlling the action of the person coerced, would be unlawful. It is sufficient if the acts threatened, although lawful, were of such a character that if done they would cause loss or injury to the person threatened of so serious a nature that the mere threat prevents him from exercising his own will in the matter and causes him, against his will, to act injuriously to the person intended to be injured.

These principles are established by a great number of decisions of the courts of this country and England. One of the latest of these is *Quinn* v. *Leathem,* in the House of Lords App. Cas., [1901] p. 495. Leathem, a butcher, was employing non-union men. Quinn and others, members of a union, threatened Leathem that if he did not discharge these men they would stop his custom and call out his union men. He

refused to discharge the objectionable men and thereupon, by threats to a customer named Munce, that they would also call out his men if he did not cease dealing with Leathem, they forced Munce to comply with their demand and cease buying of Leathem, to his injury.  One Dickie, a workman, was by similar means compelled to quit Leathem's service. The question was whether or not there was sufficient evidence to sustain a verdict for the plaintiff for damages.  Lord Brampton, referring to Dickie, who quit without notice, says: "There was an abundance of evidence that he was induced to do that wrongful act by the unjustifiable influence of the defendants."  And respecting the rights of the defendants as a trades union he says: "As members of a trades union society they have no more legal right to commit what would otherwise be unlawful wrongs than if the association to which they are attached had never come into existence.  They have no more right to coerce others pursuing the same calling as themselves to join their society or adopt their views or rules, than those who differ from them and belong to other trades associations would have a right to coerce them."  And with reference to the method of such coercion his opinion proceeds: "It is at all times a painful thing for any individual to be the object of hatred, spite, and ill-will of any one who seeks to do him harm.  But that is nothing compared to the danger and alarm created by a conspiracy formed by a number of unscrupulous enemies acting under an illegal compact, together and separately, as often as opportunity occurs, regardless of law and actuated by malevolence, to injure him and all who stand by him.  Such a conspiracy is a powerful and dangerous engine, which in this case has, I think, been employed by the defendants for the perpetration of organized and ruinous oppression."  On this subject Lord Lindley's opinion is the fullest.  The following is extracted from it: "What the defendants did was to threaten to call out the union workmen of the plaintiff and of his customers if he would not discharge some non-union men in his employ.  In other words, in order to compel the plaintiff to discharge some of his men, the defendants threatened to put the plaintiff and his customers and persons lawfully working for them, to all the inconvenience they could without violence. . . . The defendants were doing a great deal more than exercising their own rights; they

were dictating to the plaintiff and his customers and servants what they were to do." (p. 536.) "One man without others behind him who would obey his orders, could not have done what these defendants did. One man, exercising the same control over others as these defendants had, could have acted as they did, and if he had done so, I conceive that he would have committed a wrong towards the plaintiff for which the plaintiff could have maintained an action. I am aware that in *Allen* v. *Flood,* App. Cas., [1898] pp. 128, 138, Lord Herschell expressed his opinion that it was immaterial whether Allen said he would call the men out or not. This may have been so in that particular case, as there was evidence that Allen had no power to call out the men, and the men had determined to strike before Allen had anything to do with the matter. But if Lord Herschell meant to say that as a matter of law there is no difference between giving information that men will strike and making them strike, or threatening to make them strike, by calling them out, when they do not want to strike, I am unable to concur with him. It is all very well to talk about peaceable persuasion. It may be that in *Allen* v. *Flood* there was nothing more; but here there was very much more. What may begin as peaceable persuasion may easily become, and in trades union disputes generally does become, peremptory ordering, with threats, open or covert, of very unpleasant consequences to those who are not persuaded. Calling workmen out involves very serious consequences to such of them as do not obey. Black lists are real instruments of coercion, as every one whose name is on one soon discovers to his cost. A combination not to work is one thing, and is lawful. A combination to prevent others from working by annoying them if they do, is a very different thing, and is *prima facie* unlawful. . . . A threat to call men out given by a trades union official to an employer of men belonging to the union and willing to work with him, is a form of coercion, intimidation, molestation, or annoyance to them and to him very difficult to resist, and, to say the least, requiring justification. . . . It is said that conduct which is not actionable on the part of one person cannot be actionable if it is that of several acting in concert. That may be so where many do no more than one is supposed to do. But numbers may annoy and coerce where one may not. Annoyance and

coercion by many may be so intolerable as to become actionable, and produce a result which one alone could not produce. . . . Coercion by threats, open or disguised, not only of bodily harm but of serious annoyance and damage, is *prima facie,* at all events, a wrong inflicted on the person coerced; and in considering whether coercion has been applied or not, numbers cannot be disregarded."

In *Read* v. *Friendly Societies,* [1902] K. B. Div. 737, an apprentice sued the defendants for damages arising from the coercion of his employer to discharge him, by threats to call out the employer's men, all of whom belonged to the society. The court considered this to be the use of illegal means, and said regarding it: "Where illegal means have been used to bring about a breach of contract to the detriment of a party thereof, 'just cause' cannot come into the discussion at all." In *Glamorgan Co.* v. *South Wales M. Federation,* [1903] 2 K. B. Div. 573, it was held that the act of the defendants in inducing a breach of their contract of service by the employer's men could not be justified by showing that the direction to strike was made for the benefit of the men and without malice towards the employers. In *Giblan* v. *Amalgamated L. U.,* [1903] 2 K. B. Div. 620, the court said: "In my opinion, it was not essential, in order for the plaintiff to succeed, that he should establish a combination of two or more persons to do the acts complained of. In my judgment, if a person who, by virtue of his position or influence, has power to carry out his design, sets himself to the task of preventing, and succeeds in preventing, a man from obtaining or holding employment in his calling, to his injury, by reason of threats to, or special influence upon, the man's employers, or would-be employers, and the design was to carry out some spite against the man, or had for its object the compelling him to pay a debt, or any similar object not justifying the acts against the man, then that person is liable to the man for the damage consequently suffered." And on page 623, the "special influence" there intended is thus described: "Going to his employer and threatening that they would resort to the powers which were, or were believed to be, vested in them as officers of a trades union, and which involved a resort to the power of numbers in a way which might and probably would cause detriment to the employer. . . . Such acts, so persisted in, seem to me to be in

the nature of molestation or coercion; and although they do not involve recourse to physical force, I am far from satisfied that they are not such as to be illegal, even if done by a single individual."

In *Perkins* v. *Pendleton*, 90 Me. 166, [60 Am. St. Rep. 252, 38 Atl. 96], the court says: "For a person to wrongfully, that is, by employment of improper means, induce a third party to break a contract with the plaintiff, whereby injury will naturally and probably, and does in fact, ensue to the plaintiff, is actionable," although the third party has the lawful right to terminate the contract at any time. "Wherever a person, by means of fraud or intimidation, procures the breach of a contract . . . which, but for such wrongful interference, would have continued, he is liable." "The important question in an action of this kind is as to the nature of the defendant's acts and the means adopted by him to accomplish his purpose. Merely to induce another to leave an employment or discharge an employee, by persuasion or argument, however whimsical, unreasonable, or absurd, is not in and of itself unlawful, and we do not decide that such interference may become unlawful by reason of the defendant's malicious motives, but simply that to intimidate an employer, by threats, if the threats are of such a character as to produce this result, and thereby cause him to discharge an employee, whom he desired to retain and would have retained, except for such unlawful threats, is an actionable wrong." In *Vegelahn* v. *Guntner*, 167 Mass. 99, [57 Am. St. Rep. 443, 44 N. E. 1077], it is said: "A combination to do injurious acts expressly directed to another, by way of intimidation or constraint, either of himself or other persons employed or seeking to be employed by him, is outside of allowable competition, and is actionable." In *Commonwealth* v. *Hunt*, 45 Mass. (4 Met.) 111, 129, [38 Am. Dec. 346], the court says: "When an association is formed for purposes actually innocent, and afterwards its powers are abused, by those who have the control and management of it, to purposes of opposition and injustice, it will be criminal in those who misuse it, or give consent thereto." In *Lucke* v. *Clothing C. A.*, 77 Md. 407, [39 Am. St. Rep. 421, 26 Atl. 505], a cutters' union threatened the employers of Lucke that if they did not discharge him, all labor organizations would be notified that the house was a non-union house, and it appeared that this was

intended to mean, and was so understood, that all the union men in their employ would walk out, and that this would cause the employers great loss in their business. This threat so made caused the discharge of Lucke and it was held to constitute unlawful coercion and that it gave Lucke a cause of action against the union making the threats for the damages suffered therefrom. In *Cœur D'Alene Co.* v. *Miners' Union,* 51 Fed. 267, the court said: "If the things done, or the words spoken, are such that they will excite fear, or a reasonable apprehension of damages, and so influence those for whom designed as to prevent them from freely doing what they desire, and the law permits, they may be restrained, and the courts will look beyond the mere letter of the act or word into its spirit and intent." In *United States* v. *Kane,* 23 Fed. 748, the opinion by Brewer, J., shows that a threat may be sufficient if merely implied, although not expressed. In *Thomas* v. *Cincinnati etc. Railway Co.,* 62 Fed. 818, Taft, J., said: "All the employees had the right to quit their employment but they had no right to combine to quit their employment, in order thereby to compel their employers to withdraw from the mutually profitable relations with a third person, for the purpose of injuring that third person, when the relation thus sought to be broken had no effect whatever upon the character or reward of their services." (See, also, *O'Brien* v. *People,* 216 Ill. 354, [108 Am. St. Rep. 219, 75 N. E. 108]; *United States* v. *Cassidy,* 67 Fed. 698, 763; *Oxley Stave Co.* v. *Coopers' Union,* 72 Fed. 695; *Nashville* v. *McConnell,* 82 Fed. 65; *Hopkins* v. *Oxley Stave Co.,* 83 Fed. 918, [28 C. C. A. 99]; *Doremus* v. *Hennessy,* 176 Ill. 614, [68 Am. St. Rep. 203, 52 N. E. 924, 54 N. E. 524]; *Casey* v. *Cincinnati Typographical Union,* 45 Fed. 135; *Boutwell* v. *Maar,* 71 Vt. 1, [76 Am. St. Rep. 746, 42 Atl. 607]; *Jackson* v. *Stanfield,* 137 Ind. 592, [36 N. E. 345, 37 N. E. 14]; *Moran* v. *Dumphy,* 177 Mass. 485, [83 Am. St. Rep. 289, 59 N. E. 125]; *Wilcut Co.* v. *Bricklayers' Union,* (Mass.) 85 N. E. 897.)

All these expressions are but different ways of saying that the use of undue influence to compel or bring about the action of one person to the injury of a third person, is the use of illegal means to that end.

It is of no importance that the rules were adopted without special reference to the plaintiff. They were adopted for the

express purpose of being put in force against any person when the occasion should arise which made it desirable that the conduct of such person should be influenced or controlled. The effect in contemplation of law is the same as if they had been made expressly for the occasion for which they were used. Nor is the case of plaintiff defeated by the fact that the only act done by the defendants at the time of the boycott was the sending of notices that the plaintiff had been declared unfair, without threat of any sort accompanying it. It is in evidence that all the persons thus notified knew of the purport and effect of the union rules which would be applied in such a case. The defendants had created this engine of oppression for use at any time they desired, and had prepared the signal upon which it was to become active. The parties notified were aware of all this and the defendants also knew that these parties had this knowledge. Further words were unnecessary. The threat would not have been more complete if the notice had expressly stated that all business with Parkinson Company must stop under penalty of a strike of their union workmen. The defendants had arranged this condition of affairs. They cannot escape its effects on the ground that they were simply giving information of action which would inevitably take place and were doing it for the benefit of the contractors so that they might act as requested and thus avoid the damages otherwise ensuing. If the action of which this notice was given had been that of third persons for whom defendants were in nowise responsible, or with whom they were not in collusion, such a claim might stand. But the action of which they were so kindly notifying the contractors was their own action long before resolved upon. If they had no right to act in this manner for this purpose, the fact that it was previously arranged or decided upon for this or any similar occasion, was immaterial.

It is further argued that the only thing with which the customers were threatened was a strike of these customers' employees, that this threat was made by the men themselves, through their agents authorized to act for them, and that they had a lawful right to strike at any time and for any cause or no cause, and hence that their conduct was not unlawful. The principle settled by the cases cited, however, is that while men have a right to strike, they have no right by that means to

coerce their employers so as to compel them to act to the injury of a third person. The fact that they were to strike in such numbers gave them a power over the threatened customers of plaintiff, which constituted undue influence over them, or coercion or intimidation, as most of the authorities usually express it, and this coercion, exercised for the purpose of injuring a third person, is an unlawful act and makes the resulting injury an unlawful injury, which may be enjoined if only threatened, and which, if committed, may be redressed by an action for damages. It is the control of another's conduct against his will that is the unlawful element in the proposition. This being unlawful, the resulting injury to a third person is unlawful, although every other act in the transaction is lawful in itself. So far as this unlawful element is concerned it is immaterial whether that control is obtained by fear produced by the immediate prospect of serious pecuniary loss, as the result of a threatened strike, or by fear produced by a threat of bodily injury.