[Civ. No. 28971.  Second Dist., Div. Three.  Mar. 8, 1967.]

TELEVISION ADVENTURE FILMS CORPORATION et al., Plaintiffs and Appellants, v. KCOP TELEVISION, INC., et al., Defendants and Respondents.

I. B. Kornblum and David H. Kornblum for Plaintiffs and Appellants.

Lillick, Geary, McHose & Roethke, Lillick, McHose, Wheat, Adams & Charles, Castellano & Schag, Duryea, Barnes & Schag, Ernest J. Schag, Jr., and H. Bruce Baumeister for Defendants and Respondents.

SHINN, J.*—Plaintiffs and defendants are competing producers on television of travel and adventure programs. Plaintiffs have a common interest in their programs which are owned by Television Adventure Films Corporation (TAFCO). Jack Douglas is a half owner of TAFCO; he also was the owner of Jackit Productions, Inc. and Jack Douglas Enterprises, Inc. Banner Films, Inc. is a distributor of certain programs of plaintiffs outside the Los Angeles area and throughout the world. In all the transactions between plaintiffs and defendants Douglas represented all the plaintiffs and the programs will be referred to as the Douglas programs. These programs are "I Search for Adventure," "Golden Voyage," and "Bold Journey."

KCOP Television, Inc. (KCOP Tel) owns station KCOP; NAFI Corporation (NAFI) owns the stock of KCOP Tel; Wanderlust Sales, Inc. is a corporation whose stock is owned

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

half by defendant Burrud and half by KCOP Tel and NAFI; Wanderlust Sales, Inc. owns certain programs telecast by Burrud, namely, "Wanderlust," "Vagabond," "Holiday," and "True Adventure." There was another program "Treasure" which, presumably, was owned by Wanderlust Sales, Inc. Defendant Flanagan is alleged to have been the authorized representative of KCOP Tel and NAFI and authorized to act for said corporations in all their transactions with plaintiffs.

At the time the action was brought plaintiffs' programs were being telecast over station KCOP under contracts with Douglas. Defendants were then televising over the station their travelogues and adventure films. The action is for damages and an injunction, the gravamen of the demands being alleged violations of the rights of plaintiffs under their contract with the station and the violation by KCOP Tel, NAFI and defendant Flanagan of certain alleged oral agreements with respect to the telecasting of certain competing programs of defendants. Demurrers of all defendants to plaintiffs' second amended complaint were sustained without leave to amend and from the ensuing judgment of dismissal plaintiffs have appealed.

The original complaint was for "BREACH OF CONTRACT, FRAUD, PLAGIARISM, UNFAIR COMPETITION, BREACH OF TRUST AND CONFIDENCE, AND AN INJUNCTION." Upon the hearing of earlier demurrers, the court viewed certain of the parties' films under section 426, subdivision 3, Code of Civil Procedure, and properly considered them a part of the complaint. Thereafter the demurrer of Flanagan was sustained without leave to amend and the demurrers of the other defendants were sustained "without leave to amend as to the purported causes for plagiarism, breach of contract, fraud, 'agreement of good faith'; with leave to file a verified Second Amended Complaint, to consolidate any applicable provisions re unfair competition into one statement of such an alleged cause." In the second amended complaint the same grounds for relief were alleged in a single cause of action, except for the claim of plagiarism. While the complaint contains numerous allegations pertinent to a claim of plagiarism plaintiffs waive any claim based solely on that theory of recovery. Nevertheless plaintiffs alleged in the second amended complaint that there is a similarity between the format and manner of presentation of defendants' programs and those of plaintiffs which is

calculated to cause, and has caused, the viewing public to be confused and to believe that the programs of the defendants are those of the plaintiffs.

After viewing the films a second time, the court filed a memorandum opinion stating that the subjects of plaintiffs' programs were in the public domain and that defendants' programs were not deceptively imitative thereof.

There is pending a motion of defendants for the court to view the films that were viewed by the trial court, the apparent purpose of the request being to show that there has been no copying or plagiarism and that there is no such similarity as would cause confusion of the viewers, as plaintiffs allege. Plaintiffs object to a viewing of the films, asserting that the same would not be relevant to any of the issues to be considered on the appeal. Since the conclusions of the trial court, after viewing the films, were adverse to plaintiffs, and they object to our viewing them, the application for the viewing of the films is denied.

The material allegations of the complaint are the following: Prior to June 29, 1954, Douglas conceived and created an idea and format for a series of half-hour television programs entitled "I Search for Adventure" showing adventure films, made outside the United States, which were photographed and narrated by the persons whose experiences were shown, and who were interviewed by Douglas as Host-MC. In September 1954 the programs were transferred to TAFCO, owned half by Sol Lesser Productions, Inc. and Royal Productions, Inc., and half by Douglas.

June 29, 1954, Copley Press, Inc., then owner of station KCOP, agreed with Douglas to and did telecast the films for 13 weeks, with Douglas as Host-MC. October 25, 1954, Douglas and Copley Press agreed to continue the telecasting for 26 additional weeks. February 1, 1955, Douglas and Copley agreed to telecasting of certain programs, including "I Search for Adventure" from February 1, 1955, to December 31, 1955. August 12, 1955, Douglas and Copley agreed to an extension to December 31, 1956, and added new programs to the agreement. In the meantime Douglas had originated the program "Golden Voyage" which employed the format and manner of presentation of "I Search for Adventure." He had also originated a program "Kingdom of the Sea" and by the contract of February 1st, as extended, these programs were added to "I Search for Adventure" and were telecast over KCOP. "I Search for Adventure" and "Golden Voy-

age'' were telecast continuously to the time of the filing of the action. ''Golden Voyage,'' under license from TAFCO, used the idea and manner of presentation of ''I Search for Adventure.''

Prior to February 1955 defendant Burrud had been producing and telecasting, on another station, programs of travel within the United States called ''Open Road,'' which were filmed by Burrud's staff photographers and were not presented under the format of ''I Search for Adventure.'' They were not unfairly competitive. Burrud was also telecasting a program ''Wanderlust'' which was similar to ''Open Road.''

January 1956, at the suggestion of Douglas, ''Wanderlust'' was brought to KCOP and given a ''time slot'' immediately following ''Golden Voyage.'' Burrud soon began to telecast films made outside the United States and Douglas had to reschedule ''Golden Voyage'' so as not to cover the same subjects as ''Wanderlust.'' In response to insistent objections by Douglas, Flanagan, general manager of KCOP, and the then owners of KCOP (Copley) orally assured Douglas that they would restrain Burrud from including films made outside the United States, ''and thereafter defendant Burrud refrained for a period of time from doing so.'' Relying upon said assurances, on April 30, 1956, Douglas entered into a new contract superseding the February 1, 1955, contract and extending the term to January 17, 1958.

Prior to October 1957 Copley Press was negotiating for the sale of the station to Crosby, Brown, Coleman and Thomas. Application was made to the Federal Communications Commission (FCC) for approval of the sale to KCOP Television, Inc., a corporation organized by Crosby, et al. Flanagan, at that time general manager of KCOP and KCOP Tel, requested a new contract to become effective upon approval by FCC of the proposed sale and to continue to January 17, 1960. Flanagan represented that the new contract was necessary in order to further the sale. Burrud had on occasion been interviewing persons on ''Wanderlust'' and showing programs photographed outside the United States, the same as done on ''I Search for Adventure'' and ''Golden Voyage,'' to which practice Douglas objected. Douglas refused to extend the term of the contracts unless these ''unfair'' acts of Burrud were eliminated. Flanagan, on behalf of KCOP Television, Inc., orally assured Douglas that the matter would be

resolved in plaintiffs' favor as requested by Douglas and that defendant KCOP Tel would cause defendant Burrud to cease and desist from unfairly competing with "I Search for Adventure" and "Golden Voyage" on station KCOP, and would not permit anyone else to so unfairly compete; and based upon said assurance, and not otherwise, on October 4, 1957, plaintiff Douglas entered into a written agreement with defendant KCOP Tel that "as, if and when the application before the Federal Communications Commission was approved" he would furnish his personal services and Jack Douglas Enterprises, Inc., then the producing organization, agreed to furnish the programs to January 17, 1960. Disregarding the said promises KCOP Tel telecast programs of Burrud and others which misled the public and impaired the goodwill of plaintiffs, saturated the station with identical programs and forced plaintiffs to pay more money for filmed material. December 19, 1957, Douglas wrote to Flanagan complaining he had been requested to give up his Monday time slot. He also claimed that a film shown by a Mrs. Caspers had not been shot by or for Mrs. Caspers. The substance of his grievance was that the station was saturating the field of travel programs, causing him to pay more for films, and televising imitations of the programs of plaintiffs. In a reply Flanagan expressed his willingness to curtail the use of films bought on the open market and asked the indulgence of Douglas while five more half-hour telecasts of the Caspers' films were made.

The sale of the station was approved by the Federal Communications Commission. It was alleged that shortly thereafter Burrud renewed the practice of presenting on "Wanderlust" and other programs films which were photographed in foreign countries, by persons who were introduced and interviewed by Burrud, all of which, it was alleged, competed unfairly with the programs of plaintiffs and were in violation of the oral agreements. The station also placed inferior programs of Burrud in the time slots theretofore occupied by the Douglas programs.

In 1958 Burrud commenced a series called "Treasure" using the time slot which Douglas had been using for three years; thereby the station deprived Douglas of the audience he had built up and he was compelled to build up a new audience; the public believed these inferior programs were those of Douglas. As a consequence the Douglas programs lost

ratings and sponsors, and Douglas was compelled to pay more for films. All this time Douglas was under exclusive contract with the station.

March 4, 1958, Douglas protested to Flanagan by letter the use on Burrud's programs of the Douglas format and the use for the same of Douglas' former time slots. The letter stated that Burrud's programs of "Treasure" telecast on February 10, 1958, and thereafter, infringed upon the "Search" and "Voyage" format and also were similar to several buried treasure films Douglas had telecast. The Douglas letters were sent to Flanagan as the representative of KCOP Tel with whom the contracts had been made. Douglas threatened court action if the Burrud programs were not changed. Flanagan answered, conceding, as stated by Douglas, that " 'the formats of Golden Voyage and I Search for Adventure were the sole and exclusive property of TAFCO' " and that, as Douglas had stated, "the principal format ingredient of our programs has been the presentation of different people each week with different travel-adventure type films." Flanagan asserted that the "Treasure" films were not of travel or adventure, but merely accounts of searching for treasure and that the format was entirely different from that of Douglas.

March 17, 1958, Burrud telecast on "Wanderlust" a film called "From Nairobi to Zanzibar" which Douglas complained was a duplicate of the format and manner of presentation of the Douglas films. March 18, 1958, Douglas protested to Kenyon Brown, president of KCOP Tel. Thereafter Brown and Flanagan "orally assured and promised plaintiffs Douglas and Jackit, the successor to Jack Douglas Enterprises, Inc. and orally agreed that said acts would cease immediately." (Evidently these promises were made in March 1958. No consideration for them was alleged.) The acts continued and Douglas continued to object.

About May 7, 1959, Flanagan requested another extension of the contracts, stating terms to which Douglas refused to agree. As a material inducement for an extension Flanagan "as agent for and on behalf of defendant KCOP Television, Inc., some time shortly prior to May 27, 1959, orally promised and agreed that the programs of defendant Burrud would revert to their original ideas and methods of presentation and would cease to be imitative of 'I SEARCH FOR ADVENTURE' and 'BOLD JOURNEY' owned by TAFCO; that defendant KCOP Television, Inc. would not permit any other programs to do

so." Douglas requested that the oral promise and agreement be reduced to writing; Flanagan refused, saying such a writing might make it appear to the Federal Communications Commission that the station did not control its own programs, but Flanagan stated that Douglas could take his word that "this agreement was included in and was a part of the new agreements." Relying upon the oral agreement, and not otherwise, Douglas entered into a new contract to furnish his services and caused Jack Douglas Enterprises, Inc. to agree to furnish the programs to June 1, 1962.

March 16, 1959, Wanderlust Sales, Inc. was organized as a corporation, with 50 percent of the stock owned by Burrud and 50 percent by KCOP Tel. It was alleged on information and belief that the corporation owns the programs "Wanderlust," "Vagabond," "Holiday," and "True Adventure," all but "Vagabond" being televised on KCOP. Crosby, et al., organized the corporation NAFI, which owns all the stock of KCOP Tel, the owners of KCOP. Plaintiffs have always prevented others from using programs similar in format to the Douglas programs without the consent of TAFCO.

About March 1, 1961, defendants announced that a Burrud program would show a voyage of a racer from England to America which was imitative of plaintiffs' programs. Douglas protested, reminding KCOP Tel and NAFI of the oral agreement; said defendants admitted the agreement but advised Douglas they had no intention of performing said agreement. March 2, 1961, defendants and each of them produced on "Holiday" a program which "competed unfairly" with plaintiffs' programs.

Douglas notified defendants that plaintiffs would present a program on Tahiti June 8th at 7:30 p.m. immediately following the Burrud program; thereafter on May 15, 1961, defendants notified Douglas that Burrud would show a film on Tahiti June 8th from 7 to 7:30 p.m.

June 12, 1961, defendants showed a film of swimming the rapids of the Colorado by John Daggett, the film narrated by Daggett who had previously, on a Douglas program, narrated his film of swimming the Colorado rapids. It was alleged on information and belief that the film of defendants was a taped telecast of a Burrud program previously objected to.

It was alleged that Flanagan at all relevant times was acting as the agent of the other defendants and that all the alleged promises not to imitate the programs of plaintiffs, or

to compete unfairly, were falsely and fraudulently made with intent to induce Douglas to enter into the extension contracts to capture the Douglas audiences, and that said promises were made without an intent to keep the same.

We consider first the claim of unfair competition on the part of the defendants. It clearly appears that throughout his controversy with defendants Douglas believed he had an exclusive right under his written contracts with the station to telecast programs under his own format, which was to present on his programs certain persons who had filmed their experiences in foreign lands and who would be interviewed by Douglas. He also believed that station KCOP owed him a duty to not telecast travel or adventure films purchased on the open market or such a number of travel or adventure films as would saturate the interest of the viewing public and lessen interest in his own programs. While these claims to an exclusive format were asserted in the earlier complaints as a cause of action which was denominated ''plagiarism,'' they are no longer in issue.

Insofar as the claim of unfair competition is rested upon alleged copying and deceitful similarity of defendants' programs it must fail. Since the films that were viewed by the court under section 426, subdivision 3, Code of Civil Procedure, were to be considered a part of the complaint, the court was to determine whether, as a matter of law, defendants' films depicted material or manner of presentation in which Douglas had a protectible property right, or only portrayed that which was in the public domain. As we are not to view the films the determination of the trial court that, as a matter of law, there was no copying or deceitful similarity of defendants' films with those of Douglas, is conclusive. (See *Scudder Food Products, Inc.* v. *Ginzberg*, 21 Cal.2d 596 [134 P.2d 255].)

When the allegations of infringement were found to be unsustainable they ceased to serve as a basis for the claim of unfair competition. (*Hurn* v. *Oursler*, 289 U.S. 238 [77 L.Ed. 1148, 53 S.Ct. 586].) It would be inane to doubt the accuracy of this statement.

Plaintiffs argue that there was a duty resting upon defendants of fair dealing, and to refrain from conduct that would injure or destroy the rights of Douglas. They assert that this duty was breached by defendants when they scheduled the Burrud programs in or adjacent to the time slots

Douglas had been using for several years. This conduct was not actionable if it was legitimate competition, however damaging it may have been to Douglas, (*Katz* v. *Kapper*, 7 Cal.App.2d 1 [44 P.2d 1060]) and however selfish the motives of the defendants. (*J. F. Parkinson Co.* v. *Building Trades Council*, 154 Cal. 581 [98 P. 1027, 16 Ann.Cas. 1165, 21 L.R.A. N.S. 550].)

The complaint does not allege that Douglas had an agreement for the continued use of a particular "time slot." His grievance is that favorable "time slots" were given to the presentation of defendants' programs in order to provide for them an audience which he had built up. As long as the programs were not unfairly imitative of the Douglas programs defendants had a right to telecast them in competition with the Douglas films. Aside from the alleged oral contracts, no facts are pleaded which would impair or limit the right of the station to allocate the viewing times among its various programs as it might see fit. It would be an unwarranted, and, no doubt, intolerable interference with the television industry for the courts to deny stations that right.

Whether Douglas realized that he could or could not eliminate the objectionable features of the defendants' competition, except by agreement, he sought and allegedly obtained such agreements from the defendants or some of them. The claim of unfair competition is not to be confused with breach of those agreements. To amount to unfair competition the unfairness must be intrinsic in the criticized conduct. A cause of action for unfair competition cannot be carved out of the breach of agreements of the defendants to desist from fair and legitimate competition.

Since the subjects of defendants' programs and manner of presentation were in the public domain, and the programs were not televised in breach of any express or implied duty owed to plaintiffs to give them preferred use of particular time slots, there was no intrinsic unfairness and hence no unfair competition.

The claims of breaches of the oral contract and of fraud may be considered together. We need look no farther than to inquire whether they were barred by the statute of limitations as pleaded by defendants. (Code Civ. Proc., §§ 312, 337, subd. 1, § 338, subd. 4, and § 339, subd. 1.) The time for commencement of an action upon an oral contract or for the breach of it is two years. (Code Civ. Proc., § 339, subd. 1.) The time for commencement of an action for fraud is

limited to three years after the discovery of the fraud. (Code Civ. Proc., § 338, subd. 4.)

It appears clearly from the facts pleaded that the promise made April 30, 1956, was broken, and was known to plaintiffs to have been broken more than three years prior to November 6, 1961, when the action was commenced. No recovery could be had for breach of that agreement.

The next contract was entered into October 4, 1957. Any breach of that contract prior to November 6, 1958, if then known to plaintiffs, would bar an action based on that agreement. Clearly there were breaches prior to November 6, 1958. Douglas complained of such breaches by letters of December 19, 1957, and March 4, 1958. Any action based upon the October 4, 1957, agreement was barred.

There were other promises made shortly after March 18, 1958, to immediately omit features from the Burrud programs. There was no extension of the contracts at this time and no consideration was alleged for the agreements. Inasmuch as it is alleged that the agreements were not kept it must be assumed, in the absence of an allegation of a later discovery, that the agreements were broken, to the knowledge of the plaintiffs, before November 6, 1958.

We do not believe that on any theory a good cause of action is stated for breach of the 1959 agreement. As previously stated, three films of the defendants were shown in 1961. One was of a voyage of a Carlisle racer from England to Australia shown on ''Holiday'' March 2, 1961; it was alleged that the film ''competed unfairly with plaintiffs' said programs by virtue of being imitative thereof.'' The second was a film of Tahiti advertised by defendants to be shown by Burrud at 7 p.m. June 8, 1961, after defendants had been notified that Douglas would show a film on Tahiti the same evening at 7:30 p.m. The third was a film showing John Daggett swimming the Colorado River, which plaintiffs alleged on information and belief was a video tape recording of a film of Daggett swimming the Colorado River previously shown by Burrud. Among the films listed for inclusion in the record on appeal is one shown by Douglas of John Daggett and John Beare swimming the Colorado and one shown by defendants of Daggett swimming the river. These films were viewed by the trial court and we must assume that defendants' film was found not to be the same as or an imitation of the Douglas film, and not deceptive.

From the time early in 1956 when Burrud first encroached upon what Douglas regarded as his territory, Douglas had been asserting a right to the exclusive use of his idea, format, content and manner of presentation of travel programs. His complaint throughout had been that the defendants would not admit that he had a protectible property right in that format. It is alleged that in 1959, as on previous occasions, the defendants agreed not to infringe upon Douglas' format and that the agreement was breached in 1961 by showing the Carlisle, Tahiti and Daggett films. If the showing of those films violated the agreement the violation was minimal. Except for a brief period in 1956 defendants had continuously shown Burrud films which resembled in format and manner of presentation the programs of Douglas. According to the allegations of the complaint the value of the Douglas programs had been gradually depreciated by the competition of the defendants over a period of almost six years. Douglas terminated his relations with defendants November 6, 1961, because defendants refused to recognize the exclusive rights he claimed. Any damage he had sustained was attributable to the long-continued competition. If for years the competition had been unfair or if the damage Douglas had suffered was attributable to breaches of the 1956 and 1957 agreements, the liability of the defendants would have been substantial. But there could be no recovery upon any of those causes of action, and by 1959 Douglas had nothing more to lose through the alleged violation of the 1959 agreement.

Douglas did not break off his relations and bring suit solely because the defendants refused to abide by the 1959 agreement; it was merely the last straw; he alleged no damage resulting from defendants' refusal to keep that agreement, but only damage from the competition of the defendants' programs over a period of nearly six years. Unfortunately for him the success he achieved was in an entertainment industry in which, by day and by night, program competes with program, station competes with station, and sponsor competes with sponsor, in a race for the public dollar. The complaint clearly alleges that Douglas substantially lost his race with the defendants for the Los Angeles area, but this was due, primarily, to the fact that he did not have an exclusive protectible right to his particular type of travel programs.

Defendants also rely upon rulings of the court which

denied validity to the oral agreements upon grounds other than the bar of the statute of limitations. We need not review those rulings.

There is extensive argument in the brief of defendants upon the subject of plagiarism. In view of plaintiffs' concession that their claim of plagiarism was dropped from their second amended complaint and is not now pressed, the arguments of defendants do not demand attention.

Finally, we may add that we find in the complaint no allegations connecting Burrud, personally, with the alleged promises of the other defendants and the breaches of the same.

The judgment is affirmed.

Ford, P. J., and Cobey, J., concurred.

A petition for a rehearing was denied April 6, 1967, and appellants' petition for a hearing by the Supreme Court was denied May 4, 1967.